# UNITED STATES DISTRICT COURT
## OF PUERTO RICO
## CASE NO. 22-CR-00342-SCC-HRV

UNITED STATES OF AMERICA,
        Plaintiff,

v.

MARK T. ROSSINI,
        Defendant.

_____/

### MOTION TO COMPEL IDENTIFICATION OF *BRADY*, *JENCKS*, AND *GIGLIO* MATERIALS IN DISCOVERY

Mark Rossini ("Mr. Rossini" or "Rossini"), through undersigned counsels, moves this Court for an order directing the government to specifically identify all *Brady*, *Jencks*, and *Giglio* material within the vast discovery already produced. As the Supreme Court has emphasized, the government's role "transcends that of an adversary;" it is the "representative not of an ordinary party to a controversy, but of a sovereignty... whose interest... is not that it shall win a case, but that justice shall be done." *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). This prosecutorial duty places an affirmative obligation on the government to ensure timely, accessible *disclosures*.

Since August 4, 2022, this Court has repeatedly ordered the government to disclose *Brady* material. It first issued an order for disclosure as to Governor Vázquez on August 4, followed by another on August 8, 2022. [ECF Nos. 13, 18]. The Court again ordered compliance on August 9, this time regarding Mr.

Rossini. [ECF Nos. 20, 22]. By September 7, 2022, the Court issued yet another order for *Brady* disclosure, now directed at Herrera. [ECF No. 85]. On June 3, 2024, the Court expanded its directives, requiring *Jencks* and *Giglio* disclosures by August 30, 2024, and reiterated this deadline on September 13, 2024. [ECF Nos. 566, 651].

Subsequent motions and responses have only amplified the issue, including Herrera's Motion to Compel *Brady* on September 17, 2024 [ECF No. 662], the Court's referral of that motion to Magistrate Judge Hector L. Ramos-Vegas on September 23, 2024 [ECF No. 666], Mr. Rossini's objection to the government's designation of evidence and demand for *Jencks* and *Giglio* material on September 30, 2024 [ECF No. 684], and the government's resistance to these requests in its responses filed on October 1, 2024, and October 17, 2024. [ECF Nos. 687, 726].

Despite clear directives, the government has continued to oppose providing specific identification of *Giglio* and *Brady* material, arguing that their obligations are fulfilled through general disclosure buried within an overwhelming volume of data.

## I. THE GOVERNMENT'S REFUSAL TO PROPERLY DISCLOSE *BRADY* MATERIAL

From the outset, it is crucial to address two points: first, the government's claim that its 60 million-document production is "searchable" is an inaccurate misrepresentation. [ECF No. 687, pgs. 4, 10]. The government's production is anything but "searchable"; it is a scattered, chaotic data dump—

a point Mr. Rossini has been raising since January 2024. [ECF Nos. 453, 561]. The production lacks essential indexed metadata—such as dates, custodian names, participant information, and communication platform details— all of which are crucial for effective searchability. Metadata functions as a roadmap, allowing searches by categories or identifiers, so without it, even basic search parameters yield an overwhelming volume of irrelevant documents, forcing the defense to sift through vast amounts of unstructured, incoherent data. Compounding this challenge is the government's inclusion of a significant number of duplicate documents. The absence of any deduplication process means the defense must open each document individually to determine whether it is merely a repeat of another file, exponentially increasing the time and effort required to locate relevant materials. Such a chaotic and inefficient production cannot reasonably be described as "searchable" and actively hinders the defense's ability to prepare a defense.

Additionally, the production is a chaotic mix of inconsistent file types and disorganized data that makes meaningful searches nearly impossible. For instance, many PDFs lack consistent naming, have missing Bates stamps, or contain partially obscured content, so even locating a single document requires laborious sifting through files without clear order. To make matters worse, many of these PDFs are not OCR'd[1]—meaning they are not text-searchable.

---

[1] Optical Character Recognition (OCR) is the process that converts an image of text into a machine-readable text format.

So, even when the defense manages to locate a relevant document, we must manually process it for OCR just to search within its contents. Likewise, UFDR extractions—a format commonly used for digital device data—are missing basic metadata like sender and recipient information or essential indexing fields. Without this fundamental structure, searches for specific terms, people, or dates are effectively useless, as there is no reliable way to filter out irrelevant files.

The lack of organization is especially problematic because these different formats don't link related documents or preserve the natural flow of information. For example, emails, attachments, and follow-up messages are separated and disconnected, so reconstructing even a simple conversation thread becomes a painstaking task. As a result, rather than being able to search, locate, and review relevant materials efficiently, the defense is forced to wade through a maze of random files, piecing together context where possible.

Second, despite this enormous production, the government has yet to make a single *Brady* disclosure or confirm whether any exculpatory material even exists within its files. Unable to navigate its own sprawling, chaotic database, the government argues that providing "access" to the productions is sufficient in and of itself to satisfy its *Brady* obligations. This stance is both dismissive and absurd; mere "access" to millions of scattered, irrelevant materials is no substitute for meaningful disclosure. *Brady v. Maryland*, 373

U.S. 83 (1963), mandates that the government disclose exculpatory evidence—not simply produce it. As the Supreme Court stated in *Bagley*, "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley*, at 675. Further, *Kyles v. Whitley*, 514 U.S. 419 (1995), underscores that prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case," underscoring that *Brady* obligations require active disclosure, not mere production. *Id*. at 437. The distinction is essential: "disclosure" means "The act or process of making known something that was previously unknown; a revelation of facts,"[2] while "production" merely means "Collectively, the written documents or other things brought forward in support or defense of an action or prosecution."[3] By conflating these terms, the government misrepresents its constitutional duty, hoping the Court will accept that burying *Brady* material in an unsearchable mass is sufficient. The Court should see through this tactic and demand the government actually try to abide by their heightened obligation and answer one simple question: "Have you found any *Brady* material within your production?"

---

[2] DISCLOSURE, Black's Law Dictionary (12th ed. 2024).
[3] PRODUCTION, Black's Law Dictionary (12th ed. 2024).

### A. Caselaw Does Not Support the government's Refusal to Identify *Brady*

The government tries to justify its refusal to identify critical *Brady* material by arguing that caselaw does not mandate specific identification. [ECF No. 687, pp. 5-7; ECF No. 726, pp. 4-6]. This stance is evasive and misleading, and disregards the Court's repeated instructions to disclose exculpatory information. [ECF Nos. 13, 18, 20, 22, 85]. The government has both an affirmative duty to disclose *Brady* material and an "affirmative duty to resolve doubtful questions in favor of disclosure," as the "sword of Damocles" hangs over the government in disclosure obligations. *United States v. Blackley*, 986 F.Supp. 600, 607 (D.D.C. 1997). Presumably, the government has reviewed the discovery and knows— or should know —which evidence detracts from the elements it must prove.

Courts have consistently held that the government cannot simply "dump" vast quantities of discovery on the defense and expect that such a practice satisfies its *Brady* obligations. In *United States v. Saffarinia*, 424 F. Supp. 3d 46 (D.D.C. 2020), involving only about 3.5 million pages of discovery, the court held that when the government provides such an overwhelming volume, it has a constitutional duty to identify *Brady* material it knows to exist, as it would be unreasonable to expect defense counsel to locate exculpatory evidence without guidance. *Saffarinia*, at 85-86. Recognizing the undue burden, the court specifically ordered the government to identify *Brady* materials. *Saffarinia*, at 91-92.

Likewise, in *United States v. Hsia*, 24 F. Supp. 2d 14 (D.D.C. 1998), involving only about 600,000 documents, the court ordered the government to identify *Brady* material, stressing that "the government cannot meet its *Brady* obligations by providing the defense with access to hundreds of thousands of documents and then claiming the defense should have been able to find the exculpatory information in the haystack." *Hsia,* at 29. The court explained that "it simply is insufficient for the government to offer "niggling excuses" for its failure to provide potentially exculpatory evidence to the defendant, and it does so at its peril." *Hsia,* at 30.

*Saffarinia* and *Hsia* reinforce that the government's *Brady* obligations cannot be satisfied by an overwhelming, unfiltered data dump. It is incredibly disheartening, therefore, to witness the government's attempt to support its argument by misstating caselaw and its holdings. For example, the government's reliance on *United States v. Morales-Rodriguez*, 467 F.3d 1 (1st Cir. 2006), to justify its refusal to identify *Brady* materials is misplaced. [ECF No. 687, pg. 6]. *Morales-Rodriguez* involved open-file discovery, where the government provided the defense access to all documents, including two FBI reports the defense later claimed contained *Brady* material requiring disclosure. These reports were available for review before the government requested their return. *Morales-Rodriguez*, at 15. The First Circuit rejected the *Brady* argument not because it endorsed burying exculpatory evidence, but because the defense failed to review documents clearly accessible to them.

Crucially, *Morales-Rodriguez* does not indicate the volume of discovery involved, thus rendering any comparison to this case useless.

The government's reliance on *United States v. Kirk Tang Yuk*, 885 F.3d 57 (2d Cir. 2018), is similarly both misleading and inapplicable. [ECF No. 687, pg. 6]. In *Tang Yuk*, the court rejected the *Brady* violation claim not because the production method met *Brady* standards, but because the defense was ultimately able to access and use the exculpatory material and showed no prejudice. *Tang Yuk* involved thousands of images from a witness's cell phone, which the government provided shortly before trial in a format the defense argued was not "searchable." *Tang Yuk*, at 86. Critically, the court found that even if the images contained exculpatory material, the defense had failed to object to the unusable format at trial, effectively nullifying their *Brady* claim. In fact, the court expressly recognized that "burying exculpatory material within a production of a voluminous, undifferentiated open case file" could indeed violate *Brady*—a point that undermines the government's stance here. *Id*.

The government's reliance on *United States v. Pelullo*, 399 F.3d 197 (3d Cir. 2005), is also misplaced. [ECF No. 686, pg. 6, and ECF No. 726, pg. 7]. *Pelullo* involved a defendant's own business documents, which were readily accessible to him, and thus did not concern documents unknown to the defense where the government had superior knowledge. *Pelullo*, at 211. The court also noted that the defense had nearly two years to review approximately 75,000

documents—a fraction of the millions we face here. *Pelullo*, at 214. In this case, the discovery is not composed of Mr. Rossini's own documents, and thus, the defense cannot be expected to have superior knowledge of their contents or significance.

Courts have consistently emphasized that the government is in the best position to know what evidence is exculpatory based on its investigation. In *United States v. Salyer*, No. CR. S-10-0061, 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010), the court directed the government to identify *previously disclosed Brady* material. The court rejected the government's argument that doing so would be burdensome, noting that during the years-long investigation, government personnel were able to segregate evidence that supported guilt but had made no efforts to segregate exculpatory evidence. *Salyer*, at 3-5. The court held that if the government could not identify such material after years of investigation, its expectation that the defense could locate it in a few months was meritless. *Id.* at 5. The court's holding in *Salyer* highlights the government's affirmative duty to identify exculpatory material and underscores that the defense's diligence does not negate the prosecution's obligations under *Brady*.

The government's reference to *United States v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009), is also deceptive. [ECF No. 687, pg. 6, and ECF No. 726, pg. 7]. *Skilling* does not endorse data dumps. The court upheld the production because the government organized it into a searchable, electronic database

with detailed indices. Notably, the *Skilling* court warned that open-file productions "padded" with "pointless or superfluous information" could indeed violate *Brady*. *Skilling*, at 577. Fatally for the government here, one of the prosecutors admitted at the January 16, 2024, status conference that its production includes significant quantities of irrelevant material—such as "pictures, recipes, music, and movies"—and that "most of it is not relevant." [ECF No. 476, pg. 35]. It is therefore disingenuous for the government to cite *Skilling* as justification for its own indiscriminate production when it has acknowledged that irrelevant content makes up most of its production.

The government's reliance on *United States v. Young Yi*, 791 F. App'x 437 (4th Cir. 2020), is also misplaced. [ECF No. 687, pg. 6]. In *Yi*, the defendant alleged that the government violated its *Brady* obligations by failing to identify exculpatory material within its discovery production. Yi's claim failed because she did not point to any specific evidence that was withheld or show that the government suppressed anything material. *Yi*, at 438. The court also noted that the government produced the materials in time for trial, and the defendant only raised the issue post-trial in a Rule 33(a) motion, triggering plain error review. She could not meet that standard. Unlike here, *Yi* did not involve claims about unsearchable or overwhelming discovery, nor did the defendant argue that the government's production hid exculpatory material. The case has no relevance to the issues before this Court and does not support the government's position.

The government's reference to *United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010), is both misleading and ironic. [ECF No. 687, pg. 6, and ECF No. 726, pg. 7]. In *Warshak*, the defendant argued that extensive discovery was unmanageable, but the Sixth Circuit rejected this claim because the government had provided a "detailed room-by-room inventory" and identified specific computers from which data had been imaged. *Warshak*, at 296-297. Crucially, the court noted that the government did not "lard" its production with irrelevant materials, ensuring the discovery was both organized and navigable. In stark contrast, here the government admits to doing exactly that. [ECF No. 476, pg. 35]. This difference is critical: the *Warshak* court expressly warned against discovery practices that overwhelm the defense with irrelevant data under the guise of compliance. Far from supporting the government's position, *Warshak* highlights why its discovery practices in this case are indefensible.

The government's reliance on *United States v. Gray*, 648 F.3d 562 (7th Cir. 2011), is equally inappropriate. [ECF No. 687, pg. 7]. In *Gray*, the Seventh Circuit only dismissed the defendant's *Brady* claim, because it was based on speculative evidence that the government did not even have in a usable form. Gray argued that the government should have directed a third-party billing processor to generate data for potentially exculpatory timestamps. The court clarified that *Brady* requires the government to disclose existing exculpatory evidence but does not obligate it to create new evidence. *Gray*, at 566-67. Here,

however, Mr. Rossini is not asking the government to create new evidence or perform data analyses, but merely to identify exculpatory material within an unmanageable, massive production.

Once again, the government's reliance on *United States v. Rodriguez-Marrero*, 390 F.3d 1 (1st Cir. 2004), is confusing because its assertion is not only misleading but entirely inapplicable. [ECF No. 687, pg. 7]. *Rodriguez-Marrero* involved a much smaller, indexed discovery of about 20,000 pages compiled over two and a half years—nowhere near the unmanageable mass of tens of millions of unorganized documents at issue here. *Rodriguez-Marrero*, at 22 n.10. In that case, the defendant claimed a *Brady* violation, arguing that the government had withheld a police report containing statements from a confidential informant implicating others in the murder of a cooperating witness. *Rodriguez-Marrero*, at 29. The court rejected this argument, finding that the report had been included in pre-trial discovery and that the defense's failure to locate it resulted from a lack of reasonable diligence—not government misconduct. *Id*. Unlike here, where the government's disorganized data dump obstructs any reasonable review, *Rodriguez-Marrero* involved a clearly accessible discovery production. The government's attempt to equate the cases ignores the vast difference in volume, organization, and the reasonable diligence expected of defense counsel.

The government's reliance on *United States v. Healey*, 860 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2012), is also misleading and inapposite. [ECF No. 687,

pg. 8]. *Healey* does not address *Brady* obligations at all; instead, it concerns the government's Rule 16(a)(1)(B)(i) duty to disclose statements by the defendant. *Healey*, at 269. In assessing this Rule 16 issue, the court briefly analogized *Brady*, since the defense had raised concerns about proper disclosure of *inculpatory* statements. *Id*. To support this analogy, the *Healey* court cited *United States v. Ohle*, 2011 WL 651849, at *4 (S.D.N.Y. Feb. 7, 2011), which noted that the government is generally not required to direct defendants to exculpatory evidence within a mass of disclosed materials. Yet the government overlooks a key element of *Ohle* and similar cases: equal access to discovery materials was central to *Ohle*'s holding. In *Ohle*, the court found no issue with the government's production because it provided the defense with a fully searchable, organized database, thereby ensuring equal access to an organized set of documents. *Ohle*, at 4. Additionally, *Ohle* recognized that exceptions to the general rule that the government is not required to direct defendants to exculpatory evidence may exist if the "[g]overnment deliberately hid documents within a larger mass of materials or somehow purposefully confounded the defendant's search for exculpatory material." *Id*. Here, however, only the government knows the contents of the 60-million-document discovery, and it has provided the defense only a skeletal index, making navigation through this vast production overwhelmingly difficult.

The government's reliance on *United States v. Sotomayor*, No. 1:22-CR-122 (RDA), 2022 WL 17363020 (E.D. Va. Dec. 1, 2022), is also misleading. In *Sotomayor*, the discovery involved a much smaller, more organized production of roughly one million pages across 335,000 documents—a manageable volume compared to the disorganized, 60-million-document data dump in this case. *Sotomayor*, at 2. The *Brady* claim in *Sotomayor* centered on issues with accessing and using complex spreadsheet indices. *Id*. The court found no *Brady* violation, emphasizing the government's extensive steps to facilitate the defense's review: providing a searchable Excel index, sequential Bates numbers, and documents organized by source. *Id*. These proactive measures were central to the court's decision.

Moreover, *Sotomayor* does not categorically rule out the need to identify *Brady* material within large disclosures; instead, it explicitly noted that exceptions could arise, particularly in cases of government bad faith. *Sotomayor*, at 3. In support, *Sotomayor* cited *United States v. Contech Engineered Solutions LLC*, No. 5:20-CR-481-FL-2, 2021 WL 714991 (E.D.N.C. Feb. 18, 2021), which found that a *Brady* violation could exist if relevant documents were effectively buried within hundreds of thousands of irrelevant pages—an issue that directly resonates here, where relevant material is hidden within tens of millions of pages. *Contech*, at 2-4.

Several courts have criticized the government's practice of hiding crucial information within overwhelming volumes of discovery. In *United States v.*

*Bortnovsky*, 820 F.2d 572, 574-575 (2d Cir. 1987), involving only about 4,000 documents, the Second Circuit found that the district court erred by denying a motion for a bill of particulars compelling the government to reveal the dates of the burglaries at issue and the identity of three documents the government claimed were fraudulent. The court noted that the government "did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified or which of some fifteen burglaries would be demonstrated to be staged." *Bortnovsky*, at 575.

Similarly, in *United States v. Blankenship*, No. 5:14-CR-00244, 2015 WL 3687864, at 3 (S.D.W. Va. June 12, 2015)—involving only about 4 million pages of discovery—the court rejected the government's argument that providing a "searchable, indexed, digital database of documents" was sufficient under *Brady*. The court explained that the government was in a far better position than the defense to know what evidence was exculpatory or could be used for impeachment purposes and held that "the United States does not comply with the requirement of *Brady* by merely including all known *Brady* material within the four million plus pages of discovery." *Blankenship*, at 6-7. The court then ordered the government to "specifically designate any known *Brady* material" and provide it to defense counsel. *Id.*

The government's approach flagrantly evades its *Brady* obligations, relying on selective, inapplicable caselaw to justify refusing to identify

exculpatory material within its disorganized data dump. Courts consistently reject the idea that *Brady* is satisfied by overwhelming the defense with irrelevant documents, yet that is precisely what the government has done— and admitted. Clear precedent requires meaningful guidance for large productions to meet due process. By refusing to identify *Brady* material or provide a workable index, the government obstructs the defense's preparation. Mr. Rossini makes a simple request: Has the government identified any *Brady* material? If not, it should state so on the record.

### B. THE GOVERNMENT'S MISUSE OF DOJ POLICY TO JUSTIFY NONCOMPLIANCE

The government's reliance on DOJ policy to justify its refusal to identify *Brady* material is also misleading and unfounded. It conflates general discovery guidelines under Section 9-5.002 with the DOJ's specific policies for *Brady* disclosures under Section 9-5.001. [ECF No. 687, pgs. 11-13]. While Section 9-5.002 permits large-scale discovery production, it applies to general discovery, not *Brady* material. DOJ policy explicitly states that "prosecutors should not delegate the disclosure determination itself," underscoring their responsibility for ensuring discovery is accessible and organized. U.S. Dept. of Justice, Justice Manual, § 9-5.002 (Step 2).

DOJ policy under Section 9-5.001 sets a higher standard for *Brady*, requiring prosecutors to "seek all exculpatory and impeachment information from all members of the prosecution team." Justice Manual, § 9-5.001(B)(2). This duty to "seek" demands an active review for Brady material, not passive

mass disclosures. It also mandates that exculpatory information be disclosed "reasonably promptly after it is discovered." § 9-5.001(D)(1). These provisions make clear that DOJ policy requires timely, meaningful disclosure—not a data dump masked as *Brady* compliance.

In fact, DOJ guidelines explicitly mandate a thorough review of investigative materials to identify *Brady* and *Giglio* information. *See Memorandum for Department Prosecutors*, dated January 4, 2010, Step 1, Section A ("It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team."), Section B, item 1 ("The prosecutor can personally review the file or documents or may choose to request production of … materials from the case agent"), 3 ("[g]enerally, all evidence and information gathered during the investigation should be reviewed, including anything obtained during searches or via subpoenas, etc."), Step 2 ("Having gathered the information described above, prosecutors must ensure that the material is reviewed to identify discoverable information."). The court in *United States v. Salyer* underscored this point, stating:

> "nowhere in the memorandum does it even suggest that in lieu of affirmatively looking for *Brady/Giglio* the prosecutor may determine not to look at all and simply disclose the entire discovery file. The prosecutor's argument that his duty to affirmatively search for *Brady/Giglio* information is performed by not searching is oxymoronic in nature."

*Salyer*, 2010 WL 3036444 at 3.

The DOJ's own guidance further supports these standards for ESI production under the DOJ-AO Joint Working Group on Electronic Technology in the Criminal Justice System (JETWG).[4] The JETWG recommendations set out clear expectations: documents should be unitized as standalone items, OCR-scanned for searchability, consistently Bates-stamped, and embedded with metadata fields such as dates, sender and recipient information, and custodian names. JETWG, § 6 (Production of ESI).

The government's production strategy starkly contravenes the DOJ's own standards for ESI. By disregarding DOJ policy, the JETWG's guidelines, and misinterpreting its *Brady* obligations, the government has effectively buried crucial *Brady* material within an unmanageable data dump.

### C. The government's "Pandora's Box" Argument is a Transparent Tactic to Evade *Brady* Obligations

The government's "Pandora's box" argument is nothing more than a transparent attempt to evade its *Brady* obligations by making the defense's request seem unreasonable. [ECF No. 687, pgs. 13-25]. The government claims that the defense is requesting a line-by-line review of every document—a task they argue would overwhelm future cases involving electronic discovery—in a clear exaggeration intended to dissuade the Court from requiring them to meet

---

[4] Department of Justice and Administrative Office of The U.S. Courts Joint Working Group on Electronic Technology in the Criminal Justice System, *Recommendations for Electronically Stores Information (ESI) Discovery Production in Federal Criminal Cases* (2012), available at https://www.justice.gov/archives/dag/page/file/913236/download

their basic *Brady* obligations. *Id*. But this mischaracterizes Mr. Rossini's request entirely. Mr. Rossini is not asking for exhaustive document-by-document review; he is simply asking the government to identify any exculpatory *Brady* material in its own production, as required by due process.

The government's argument is especially unfounded given its repeated assertions that the 60-million-document production it dumped on the defense is "searchable." As the JETWG has acknowledged, true searchability and accessibility in electronic discovery require organized production with clear metadata, Bates numbering, OCR, and file consistency. JETWG, § 6 (Production of ESI).

Finally, the Supreme Court has made clear that the government has an affirmative duty to disclose exculpatory material in compliance with due process. This duty cannot be sidestepped by burying the defense in unusable and vast volumes of information, especially when much of it is admittedly irrelevant. It is disingenuous for the government to suggest otherwise, and Your Honor should not be swayed by exaggerated claims of procedural gridlock. The Court should not permit the government to evade its constitutional responsibility by reducing Brady compliance to a meaningless bureaucratic exercise.

## II. THE GOVERNMENT'S *JENCKS* PRODUCTION IS INADEQUATE.

The *Jencks* Act, codified in 18 U.S.C. § 3500, requires that the government disclose statements of witnesses after those witnesses testify on

direct examination, allowing the defense access to materials necessary for cross-examination. 18 U.S.C.A. § 3500(a). Although the Act does not mandate pretrial disclosure, some courts have permitted early *Jencks* disclosures in the interests of due process, effective assistance of counsel, and overall trial efficiency—where the government has voluntarily agreed to such timing. *United States v. Beckford*, 962 F. Supp. 780 (E.D. Va. 1997) (the court ordered *Jencks* Act materials disclosed before jury selection based on an agreement by the government to an early timeline); *United States v. Tarantino*, 846 F.2d 1384, 1415 n.12 (D.C. Cir. 1988); (recognizing the early production as beneficial and "sensible" when voluntarily agreed upon); *United States v. McKenzie*, 768 F.2d 602, 609 (6th Cir. 1985) (commending early production to "avoid the interruptions and delay at trial," while noting that "such an agreement does not lessen the government's obligation…."); *United States v. Percevault*, 490 F.2d 126, 132 (2d Cir. 1974) (noting that *Jencks* Act material "should be transmitted prior to trial, especially in complex cases"); *United States v. Gardin*, 382 F.2d 601, 605 (2d Cir. 1967) (indicating that the trial judge has broad discretion in administering the *Jencks* Act).

When the government consents to early *Jencks* production, as it did here, it is expected to comply in good faith. [ECF Nos. 566, 651]. If the government had declined early production of *Jencks* material, opting instead to provide it after each witness's direct testimony during trial, it would be required to hand over statements specific to each witness immediately following their

testimony. This method would naturally make it clear to the defense which documents pertain to which witness. By choosing early disclosure in bulk, however, the government cannot sidestep its duty to identify which documents belong to which witness simply because it opted for a single pre-trial production.

Here, the government's *Jenck's* production remains a disorganized, chaotic mass that is practically unusable in its current form. Rather than offer a clear, systematic disclosure, the government has dumped 1,472 files into a single folder labeled "*Jencks*," with no index or log and no coherent naming conventions to allow the defense to determine the contents, origin, or relevance of each document.

The "*Jencks*" folder contains:

| File Type | Quantity |
|---|---|
| PDF Files | 345 |
| HTML Documents | 2 |
| JPEG Files | 60 |
| Excel Files | 60 |
| PowerPoint Presentations | 4 |
| Word Documents | 267 |
| MP4 File | 1 |
| OXPS File | 1 |
| Emails | 725 |
| PNG Files | 7 |

Each file is assigned a non-descriptive Bates number, like "DOJ-0008430255," which provides no indication of which witness or subject it pertains to, or what relevant information it may contain. This arbitrary approach ignores both the spirit and the letter of *Jencks*, which mandates timely and accessible disclosure of witness statements.

The Bates numbering highlights the disorder in this production. The first Bates number in the government's "Jencks" folder is DOJ-0008430255, and the last is DOJ-0008440557. Subtracting the two (8440557 – 8430255) suggests 10,302 sequential pages, yet only 1,472 files are provided. This figure excludes the 60 Excel files and 725 emails in the folder. Without opening each email, there is no way to assess its length or scope—some may be extensive threads spanning months. Similarly, the Excel files could contain numerous sheets, rows, and embedded data, greatly increasing the data volume. Thus, 10,302 pages is a conservative estimate of the actual production size.



The government's argument—that it has identified the witness associated with each document by suggesting the defense open each file individually to look for internal details like email headers or sender names—is not only disingenuous but frankly embarrassing for the United States government to assert in a formal filing. [ECF No. 726, pg. 10]. The government

knows full well that the defense's issue is not with what becomes visible after each document is opened, but with the total lack of any external labeling or indicator as to each document's relevance or context. Forcing the defense to sift through thousands of cryptically named files to search for hidden, internal clues is a clear attempt to evade its duty to provide an organized and usable production.

Further, the government's recommended solution only plausibly applies to the 725 emails in the folder, where sender or recipient information may sometimes provide context. However, this approach fails completely for the other file types, including Word documents, Excel sheets, images, and many of the PDFs, which contain no such header information.

It defies logic to believe that the government does not possess an organized version of these 1,472 files. These materials were almost certainly pulled from structured sources, making it unlikely they were compiled into a single, unordered folder. The clear inference is that the government has an organized version of these materials which has not been provided to the defense.

## III. The government's Refusal to Provide *Giglio* Material Violates This Court's Orders and Undermines the Integrity of these Proceedings

The government's response to Mr. Rossini's demand for *Giglio* material—vital impeachment evidence crucial for a fair trial—is both dismissive of the Court's authority and outright defiant of its direct orders.

Despite a June 3, 2024, Order from this Court directing the government to produce all *Giglio* material by August 30, 2024, [ECF Nos. 566 and 578, pg. 37], and a reiteration on September 13, 2024, [ECF No. 651], the government has failed to comply. Notably, the government raised no objections to this requirement at the time it was ordered; thus, its present stance is indefensible.

The government claims—via a footnote—that any *Giglio* material it has gathered is buried somewhere within the 60 million documents it dumped on the defense, without an index, identification, or even a placeholder "*Giglio* folder" as it did for *Jencks* material. For *Giglio* material specific to testifying agents, the government asserts it will conduct a "*Giglio* check" closer to trial. [ECF No. 726, pg. 9 n.4]. This approach flagrantly defies this Court's explicit directive, disregards Mr. Rossini's due process rights, and undermines fair trial principles. The government's duty to disclose "... covers impeachment evidence too, even if the evidence is not inherently exculpatory." *United States v. Acosta-Colón*, 741 F.3d 179, 195 (1st Cir. 2013) (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)). By refusing to organize or identify specific *Giglio* material, the government essentially dares the defense to sift through an unmanageable discovery dump to find critical evidence.

The government should be compelled to clearly identify the *Giglio* material it claims to have produced. In support of this demand, Mr. Rossini expressly adopts all prior arguments, made in this motion, regarding the government's discovery practices.   As for the planned last-minute "*Giglio*

check" on testifying agents, there is no basis for delay. This Court has the authority to order early *Giglio* disclosure and has already done so in this case. The government must comply with the Court's orders without further delay or excuse.

## IV. CONCLUSION

The Constitution does not allow *Brady* compliance to devolve into a bureaucratic shell game, nor permit the government to overwhelm the defense with irrelevant data to avoid timely and transparent disclosure. The government's arguments here are disingenuous and undermine both this Court's authority and the integrity of a fair trial. By ignoring the Court's clear orders and burying critical material in a chaotic, unusable production—most of which it has admitted is irrelevant—the government has effectively denied the defense meaningful access to *Brady*, *Giglio*, and *Jencks* information. Compliance requires organized, accessible disclosures, not obstructive data dumps.

**WHEREFORE**, Mr. Rossini respectfully requests that this Court enforce its orders and compel the government to fulfill its obligations in a clear and usable format essential for a fair trial.

Respectfully submitted,

*/s/ Lydia Lizarribar Masini*
**LIZARRIBAR MASINI LAW OFFICE**
G-14 O'Neill Street, Suite A
San Juan, PR 00918
Telephone: (787) 250-7505
lizarribarlaw@gmail.com

**STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC**
Two South Biscayne Boulevard,
Suite 1600, Miami, FL 33131
Telephone: (305) 614-1400

/s/ *Michael B. Nadler*
Michael B. Nadler
Fla. Bar No. 51264
mnadler@sknlaw.com

/s/ *Juan J. Michelen*
Juan J. Michelen
Fla. Bar No. 92901
jmichelen@sknlaw.com
*Admitted pro hac vice*

*Attorneys for Mark T. Rossini*

## CERTIFICATE OF SERVICE

I certify that on November 21, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, causing a copy to be served on counsel of record.

/s/ *Juan J. Michelen*
Juan J. Michelen