IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

JULIO HERRERA VELUTINI,

MARK T. ROSSINI,

    Defendants.

CRIMINAL NO. 22-342 (SCC)

**JOINT OBJECTIONS TO THE MAGISTRATE'S MEMORANDUM AND ORDER
AT ECF NO. 819**

    Mark Rossini ("Mr. Rossini" or "Rossini") and Julio Herrera Velutini ("Mr. Herrera" or "Herrera"), through undersigned counsel, submit these objections to the Magistrate Memorandum and Order (the "Order") **[ECF No. 819]**, which denied their motions to compel the government to identify *Brady*, *Jencks*, and *Giglio* material in its discovery productions **[ECF Nos. 662, 755]**[1]. The Order misapprehends both the factual record and governing law, overlooks the government's failure to comply with this Court's orders, and disregards fundamental due process requirements.

    Under 28 U.S.C. § 636(b)(1)(A), the magistrate's findings can be reconsidered where "the magistrate judge's order is clearly erroneous or contrary to law." *See also* L.Crim.R. 72(c). While this review is

---

[1] The government opposed both motions. *See* **[ECF Nos. 687, 767]**. Rossini and Herrera filed replies in further support of their motions. *See* **[ECF Nos. 718, 777]**.

deferential, where a party establishes that the magistrate's order is clearly erroneous or contrary to law, reversal is required.

## I. OBJECTION NO. 1: THE MAGISTRATE JUDGE ERRONEOUSLY CONCLUDED THAT THE GOVERNMENT SATISFIED ITS *BRADY, JENCKS,* AND *GIGLIO* OBLIGATIONS THROUGH "OPEN FILE" DISCOVERY.

The Magistrate Judge's reliance on the government's "open file" production as a proxy for *Brady* compliance fundamentally misconstrues what the law requires. After two years of delay, and complete resistance to the Defendants' demands for discovery, the government dumped over 60 million pages of disorganized, unsearchable, and mostly irrelevant documents on the defense, without any index or effort to identify exculpatory material. These abusive discovery practices further demonstrate the ill-conceived, politically motivated and weaponized nature of this prosecution.  The government first withholds evidence and then when forced dumps it all on the Defendants while admitting it never reviewed much (if any) of the materials produced.  That is not disclosure, that is concealment by volume.  Unfortunately, the Magistrate has condoned these practices, effectively granting the government a license to hide potentially critical exculpatory material by claiming that its entire file is open for review.

However, the law is clear: what matters is not the size of the file, but **what the government does in addition to granting access to a voluminous open file**. *United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009). Here, the government did nothing. No roadmap. No indexes. No

identification of known exculpatory evidence. Just a data dump. That approach has been rejected by every court that has seriously considered it. *United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) ("The government cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials."); *United States v. Saffarinia*, 424 F. Supp. 3d 46, 85–86 (D.D.C. 2020) (requiring the government to identify known *Brady* material in large-scale productions); *United States v. Hsia*, 24 F. Supp. 2d 14, 29–30 (D.D.C. 1998) (holding that open access to voluminous discovery does not satisfy *Brady* when the government knows where the exculpatory material is and refuses to say).  What is even more shocking, is that the government effectively admits it has never reviewed all this material.

What sets this case apart—and what the Order fails to grapple with—is the **scale** and **structure** of the production. This is not a large case. This is an unprecedented case. Defense counsel is aware of no case where the government has produced 60 million pages of discovery in this condition—stripped of meaningful metadata, stripped of basic file structure, and padded with irrelevant files (including "pictures, recipes, music, and movies," per the government itself, see **[ECF No. 767 at 9]**)—and claimed that doing so satisfied its *Brady* obligations.

The government and the Magistrate Judge both fall back on the claim that there is no binding precedent requiring the identification of *Brady* in large document productions. But that is not a legal defense—it is a non

sequitur. There are not many cases like this because, thankfully, the government does not usually engage in such abusive and weaponized behavior by dumping massive productions like this on Defendants more than two years post-indictment. No one was dealing with 60 million documents in the 1980s, the 1990s, or even most of the 2000s. Back then, discovery meant bankers' boxes, maybe scanned PDFs. Email servers weren't cloud-based. Social media wasn't a discovery source. Mobile extractions didn't exist. This problem is new—because the technology that created it is new.

Today, the government has access to:

- **Full-disk mobile device extractions**, including encrypted apps, deleted data, and cross-platform threads

- **Cloud-based captures** from Exchange, Gmail, Dropbox, OneDrive, and app metadata

- **Encrypted chat logs** from WhatsApp, Signal, iMessage, often extracted using tools like Cellebrite UFED or GrayKey

- **Geolocation and telematics data**, including tower dumps, GPS pings, surveillance footage, and timestamped metadata; and

- **Backend server logs and system traces**, including user session data and real-time API activity

That is extraordinary technological progress—and with it comes extraordinary responsibility. The same systems that let the government collect and ingest that data also give it the ability to filter, deduplicate, tag, and

isolate responsive documents. Further, the fact the government chose to gather all of this data does not then mean it is relieved of the fundamental obligation to review the material and identify *Brady* material.

To the contrary, if the government chooses to weaponize modern e-discovery capabilities to collect data "because we can," *see United States v. Salyer*, No. CR. S-10-0061, 2010 WL 3036444, at *9 (E.D. Cal. Aug. 2, 2010), then it assumes a corresponding obligation: to identify the exculpatory material it knows—or should know—is in its possession. No defense team—regardless of skill, funding, or manpower—can meaningfully review 60 million unindexed, unsearchable documents buried in a digital wasteland. And no court should pretend otherwise.

Moreover, the notion that courts lack authority to compel identification is simply wrong. Courts have discretion to do so as a matter of **fairness and case management**. *See United States v. W.R. Grace*, 526 F.3d 499, 509–10 (9th Cir. 2008) (*en banc*); *Salyer*, 2010 WL 3036444, at *3–4. Rule 16's advisory notes explicitly authorize judges to go beyond the rule's baseline where needed. As the *Salyer* court held, "there is no authority which prohibits the court's exercise of discretion here." *Salyer*, 2010 WL 3036444, at * 5.

This isn't just about discretion—it's also about the government's duty. Under *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), prosecutors ***must*** affirmatively seek out favorable information from all members of the prosecution team. The Ninth Circuit reaffirmed that in *United States v. Price*,

566 F.3d 900, 908–09 (9th Cir. 2009). And DOJ's own 2010 *Brady/Giglio* Memorandum confirms that prosecutors must conduct an actual review of case materials. *See Memorandum for Department Prosecutors,* dated January 4, 2010, Sec. B.1, B.3. Nowhere do those guidelines say prosecutors may decline to review everything and then call it compliance. As *Salyer* put it, the idea that "not searching" satisfies a duty to affirmatively search is "oxymoronic."

Even worse, the government has now suggested that identifying *Brady* in this production would be too burdensome. But that is the point! If the government has not and cannot review its own production, then it certainly cannot argue it has satisfied its *Brady* obligations. As *Salyer* explained, "what the government is actually arguing... is that logistics in the 'big documents' case render *Brady/Giglio* a dead letter." *Id.* at *5. That argument doesn't excuse a violation—it **proves** one.

Which brings us back to the question we posed in our motion: **Has the government identified any *Brady* material in its own production?** Defendants asked because the answer is obvious—they have not. And they have not because they cannot. If they cannot say whether exculpatory evidence is in there, then the parties are heading to trial with potentially critical evidence buried in a digital haystack—and the government (and now the Magistrate) pretend that is fine.

The Order also dismisses the *Jencks* and *Giglio* arguments by claiming it is unclear what relief could even be granted, suggesting that ordering the

government to "organize the production to Rossini's liking" would be inappropriate. **[ECF No. 819 at 9]**. But that entirely misrepresents what Defendants asked for and ignores the specific relief Defendants requested. Defendants asked the government to do what it would be required to do if it had withheld *Jencks* material until trial: **match each statement to its witness.** If the government had waited until direct examination, it would be obligated to hand over the witness's prior statements. By choosing to produce them early in bulk, it doesn't get to evade that basic obligation. Defendants asked the Court to compel the government to identify which documents belong to which witnesses. That is not a radical demand—it is statutory compliance. The government already knows what belongs to whom. The only thing the government is refusing to do is tell the Defendants.

Thus, this is not a *Brady* violation waiting to happen but rather a *Brady* violation happening in real time. The fact that no case has yet confronted this situation clearly is not a reason to ignore it. The Constitution does not disappear just because the government's server capacity expanded. And a 60-million-page dump—with no identification of known *Brady* materials, no meaningful search tools, and no effort at all by the government to comply—is not disclosure under any definition of the word. The only thing different here is that the problem is now too big to hide.

## II. OBJECTION NO. 2: THE MAGISTRATE JUDGE ERRONEOUSLY ACCEPTED THE GOVERNMENT'S REPRESENTATIONS ABOUT SEARCHABILITY AND FORM OF PRODUCTION

The Magistrate Judge accepted the government's bare, unsworn claim that it produced discovery in a "searchable" and "load-ready" format. Such reliance on unsupported statements is clearly erroneous. Moreover, such blind reliance ignores the detailed record before the Court, including the sworn affidavit of eDiscovery expert Michael Russo, which establishes—conclusively here given it is unrebutted—that the government's production was not meaningfully searchable, not properly indexed, and not compliant with basic eDiscovery standards.

Mr. Russo's review of Discovery 11—offered as a representative example—confirms that the government's production was effectively unusable for any practical legal review. While the analysis focused on Discovery 11, the same systemic and overwhelming deficiencies appear throughout the government's broader discovery, which spans nearly 30 separate productions. *As established by the only record evidence before the Court*, despite being labeled "load-ready," the productions lacked the most basic structure and searchability required for meaningful review:

1. **Metadata critical for review was missing.** The production omitted essential fields including date created, date sent, date received, file extension, file size, custodian, conversation participants, and communication platform (e.g., SMS, WhatsApp,

Signal). Without these fields, defense counsel cannot sort messages chronologically, identify attachments, or trace authorship. [**Exhibit A: Russo Affidavit at 5–6**].

2. **Nearly 700,000 documents were mislabeled or incomplete.** Over 684,000 files were ".ufdr" extractions from mobile devices, but instead of producing them in their standard native format—which would preserve message threads and metadata—the government converted them into stripped-down formats that severed relationships between messages, contacts, and attachments. That choice made the data exponentially harder to search and understand. [**Exhibit A: Russo Affidavit at 4**].

3. **The government failed to deduplicate or sort documents by custodian.** Reviewers were forced to manually re-review the same documents multiple times across the production. Key fields like "Custodian," "Date Sent," and "Participants" were entirely missing, rendering any meaningful filtering or sorting impossible. [**Exhibit A: Russo Affidavit at 3–5**].

4. **Image and multimedia files vastly outweighed relevant content.** Over 265 GB of the production consisted of image files, with an additional 100 GB of video and nearly 5 GB of audio—most of it irrelevant. The meaningful content (Office documents and emails) amounted to just 9.2 GB. The ratio of noise to signal in this

production is staggering and appears designed to overwhelm rather than inform. **[Exhibit A: Russo Affidavit at 2]**.

5. **Massive files were obscured.** Thirteen key documents containing over 120,000 pages of messages were buried in the production. Many were disguised behind slip sheets that made no mention of their content or relevance. **[Exhibit A: Russo Affidavit at 6]**.

6. **Only 27 documents (out of more than 1.1 million) were produced in compliance with industry standards.** That's less than 0.003%. **[Exhibit A: Russo Affidavit at 6]**.

The Order ignores all of this record evidence, choosing instead to simply adopt the government's unsupported representations and fails to even address the Russo Affidavit or the numerous factual submissions in ECF Nos. 755 and 777, which repeatedly flagged these issues. The defense didn't just raise concerns—it submitted actual evidence in the form of a detailed technical analysis showing why this production fails even the most basic threshold for usability.

The government had the ability to produce this material in a way that was actually usable. It chose not to do so. The Magistrate's decision to ignore the only evidence in the record and excuse the government's abject failure reflects a fundamental misunderstanding of modern discovery. That decision should not be affirmed.

### III. OBJECTION NO. 3: THE ORDER WRONGLY DISMISSES LEGITIMATE CONCERNS ABOUT BAD FAITH AND BLINDLY ACCEPTS THE GOVERNMENT'S REPRESENTATIONS

The Order dismisses any suggestion that the government acted in bad faith, characterizing the defense's concerns as "speculation" and stating that there is "no reason to doubt" the government's representations about the nature of its production. **[ECF No. 819 at 5-6]**. But that framing ignores both the reality of how this case has unfolded and the standard of review that should apply when constitutional rights are at stake.

No one expects to find a smoking gun email from prosecutors saying, "Let's make the discovery unsearchable." That's not how bad faith is proven. Bad faith is proven circumstantially, and the facts here speak for themselves. As noted, the government willfully withheld all of this discovery for two years post-indictment. Moreover, the government has been on notice for well over a year that its productions are disorganized, deficient, and unusable. Defendants have flagged missing metadata, unsearchable files, stripped-down phone extractions, and entire witness statements dumped into folders without identifiers. Defendants submitted sworn expert analysis. Defendants explained it in motion after motion. Yet the government continues to claim its discovery is "organized" and "searchable" *without offering any actual evidentiary proof!*

At a certain point, continued misrepresentations after repeated notice stop being negligent. They become willful. And that point was crossed long

ago. The idea that prosecutors who have seen this discovery and know the formats are still claiming this is usable is demonstrable bad faith. Such deliberate indifference to what has been produced and what may be buried inside that production is simply untenable.

Equally troubling is the Order's assertion that "it does not appear that the defense has been given a disclosure different in terms of format, searchability, or indexing than what the government itself has." But there is nothing in the record to support this assertion. The government has not shown the Court—or the defense—how it organizes and accesses its own material. It has not demonstrated (or even proffered) what its agents used to find and evaluate the very evidence they plan to present at trial. Yet somehow, the Magistrate concluded there is "no reason to doubt" the government's position.

Certainly, this Court would not hesitate to scrutinize a defendant who made unverified claims about inaccessible evidence. So, there is simply no justification for allowing the government to be the only party in this case that is not required to back up its assertions with facts.

For over a year, the defense has documented specific, concrete discovery failures—backed by expert analysis and unrebutted examples. To suggest that these problems have been exaggerated or fabricated is simply unfounded and contrary to the record evidence. When the constitutional rights of the accused are at stake, this Court should not accept the government's word at face value. It should ask questions. It should demand answers. And until those answers

are provided, it should not—and cannot—endorse a process that renders meaningful defense review impossible.

**WHEREFORE**, Mr. Rossini and Mr. Herrera respectfully request that the Court reject the Magistrate Judge's Order at **ECF No. 819**, compel the government to specifically identify all *Brady*, *Jencks*, and *Giglio* materials in its productions, and hold an evidentiary hearing, if necessary, to resolve any disputed facts.

Respectfully submitted,

*/s/ Lydia Lizarribar Masini*
**LIZARRIBAR MASINI LAW OFFICE**
G-14 O'Neill Street, Suite A
San Juan, PR 00918
Telephone: (787) 250-7505
lizarribarlaw@gmail.com

**STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC**
Two South Biscayne Boulevard,
Suite 1600, Miami, FL 33131
Telephone: (305) 614-1400

/s/ *Michael B. Nadler*
Michael B. Nadler
Fla. Bar No. 51264
mnadler@sknlaw.com

/s/ *Juan J. Michelen*
Juan J. Michelen
Fla. Bar No. 92901
jmichelen@sknlaw.com

*Admitted pro hac vice*
*Attorneys for Mark T. Rossini*

## CERTIFICATE OF SERVICE

I certify that on April 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, causing a copy to be served on counsel of record.

/s/ *Juan J. Michelen*
Juan J. Michelen